# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 10, 2007 Session

## MICHAEL WALLACE SHERROD v. TENNESSEE DEPARTMENT OF HUMAN SERVICES, ET AL.

### Appeal from the Circuit Court for Robertson County
### No. 10705   Ross H. Hicks, Judge

---

### No. M2005-01106-COA-R3-CV - Filed July 25, 2008

---

The circuit court affirmed a final administrative order of the Tennessee Department of Human Services establishing a divorced father's child support arrearage, directing that support be paid to the Central Child Support Receipting Unit, and issuing tax refund intercept notices. On appeal, the father contends that he did not owe the arrearage assessed against him, making the intercept notices invalid, that there were numerous irregularities in the administrative proceedings, and that compelling him to make payments in the manner ordered violates his religious rights under the Tennessee Constitution. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Michael Wallace Sherrod, Springfield, Tennessee, Pro Se.

Paul G. Summers, Attorney General and Reporter, Warren Jasper, Assistant Attorney General, for the appellees, Tennessee Department of Human Services, Brenda Wix, and Paul G. Summers.

## OPINION

Mr. Sherrod appeals from an order of the trial court affirming a final administrative order of the Tennessee Department of Human Services ("DHS" or "the Department") regarding his child support obligation and administrative efforts to enforce that obligation. The final administrative order addressed the validity of two notices regarding interception of any income tax refund due Mr. Sherrod, calculated the amount of arrearage owed by him, and affirmed the redirection of his payments.

The dispute herein arose after DHS became involved in enforcing Mr. Sherrod's child support obligation and sent him several letters or notices in late May or early June of 2003. One of

those notices required that Mr. Sherrod send future child support payments, not to his former wife or to the clerk of the divorcing court, but instead to the State's Central Child Support Receipting Unit. That directive and the discovery by Mr. Sherrod that the State's enforcement duties, although set out in state statutes, stemmed from federal statutes that included a provision numbered 42 U.S.C. § 666 caused Mr. Sherrod to resist the State's efforts and to refuse to pay support as directed by DHS. He maintains that his refusal arises from his religious convictions.

## I. THE CHILD SUPPORT OBLIGATION

Michael Sherrod and Brenda Wix were declared divorced by the Robertson County Circuit Court in 1988. Ms. Wix was awarded custody of the couple's son, and Mr. Sherrod was granted visitation and ordered to pay child support of $75 per week directly to his former wife. The divorce decree was later modified to eliminate Mr. Sherrod's child support obligation for the months of June and July each year, because of the extensive summer visitation he exercised with his son during those months.

Mr. Sherrod, who is self-employed,[1] did not make all his weekly payments as ordered. On December 7, 2000 the Circuit Court entered an order finding him in contempt and awarding Ms. Wix a judgment for $819.89 in child support arrearages, which the court ordered to be paid in $10 installments. Those arrearages were apparently paid in full. Unfortunately, Mr. Sherrod fell behind in his child support payments once again, and on February 19, 2003, Ms. Wix applied for assistance with child support enforcement from the DHS. There is no dispute that the Department's assistance was provided pursuant to Title IV-D of the Social Security Act.

The Department's Child Support Office then sent Mr. Sherrod the first of many automatically generated notices in regard to his support obligation. The first notice, dated May 29, stated Mr. Sherrod would henceforth be billed monthly by the Department for child support and that an address would be furnished to which the payment was to be sent. This is apparently the letter referred to in this case as an administrative order to redirect child support payments. On June 5, 2003, Mr. Sherrod received a Federal Tax Refund Offset Notice, declaring that he owed past due child support "at least in the amount of $1,188 as of 5/31/03."[2] Such a notice announces the Department's intention to seize any federal income tax refund to satisfy a recipient's child support obligation, which the Department is only authorized to do when the arrearage is above $500. *See* Tenn. Code Ann. § 36-5-

---

[1]Because Mr. Sherrod is self-employed, collection of child support through wage assignment has not been available.

[2]The Department also issued a "Credit Bureau" notice, which reports child support arrearages to credit bureaus. Mr. Sherrod challenged the issuance of this notice. While there is little discussion in the record of this notice *per se*, the validity of its issuance is determined by the facts relevant to the other notices.

101(s); 45 C.F.R. § 303.72(a)(3).[3] On June 9, 2003, Ms. Wix filed a notarized statement of child support arrearage through May 31, 2003, in the amount of $1,211.43.

Mr. Sherrod made a child support payment of $1,188.57[4] by check on June 24, 2003, to the Central Child Support Receipting Unit and, on June 20, filed an "Appeal for Fair Hearing" on Department forms and requested an administrative hearing on several items, including the order to redirect support and the income tax refund intercept. *See* Tenn. Code Ann. § 36-5-1001.

Mr. Sherrod admits that he made no subsequent child support payments. He contends that he remains willing at all times to make his support payments to Ms. Wix directly or through the clerk of the circuit court, but that he absolutely refuses to make any further payments through the State's Central Child Support Receipting Unit because of his religious objections. As a result, his arrearage began to accumulate again. According to him, "[v]arious automated delinquency notices, offset notices, payment demands and such followed." These included a second Federal Tax Refund Offset Notice, which was dated November 6, 2003. Mr. Sherrod did not ask for administrative review or a hearing on this notice.

## II. ADMINISTRATIVE PROCEEDINGS

A prehearing conference was held before Hearing Officer Scott Black. Mr. Sherrod stated at the hearing that he wanted to pay whatever he owed, but that he refused to violate his religious conscience by being subjected to the State Child Support Enforcement System. The conference largely dealt with procedural and practical matters in preparation for the hearing. The dispositive hearing was conducted on January 6, 2004, before Hearing Officer April Martin. The scope of inquiry of the hearing included evidence of the additional arrearage Mr. Sherrod had accumulated after May 31, 2003.[5] Mr. Sherrod disputed DHS's figures, and the Hearing Officer gave him ten days to substantiate his claim by providing proof of the payments he made.[6]

On May 5, 2004, an Initial Order was entered, which included a summary of the hearing, findings of fact, and conclusions of law. The order affirmed the amount of arrearage sworn to by

---

[3]As part of the Tax Refund Interception Program, a state child support enforcement agency informs the U.S. Department of Health and Human Services that a parent is past due in child support by a specified amount, and HHS notifies the Internal Revenue Service, which intercepts any tax refund due that parent and returns an appropriate portion to the state to apply toward back support. 15 Mertens Law of Fed. Income Tax'n § 58:17. A post-interception hearing regarding arrearages satisfies due process requirements. *McClelland v. Massinga*, 786 F.2d 1205 (4th Cir. 1986).

[4]This was the amount listed as an outstanding balance in a "Notice of Periodic Reporting to Credit Bureaus" mailed to Mr. Sherrod on June 20, 2003.

[5]In the pre-hearing conference, Scott Black had stated that arrearages accrued after May 31, 2003, had to be the subject of a separate hearing.

[6]Mr. Sherrod subsequently submitted cancelled checks dating from November 10, 2000, to May 16, 2003, all payable to Ms. Wix.

Ms. Wix as of May 31, 2003, and upheld the Department's submission of Mr. Sherrod's name to the Federal Tax Refund Offset program since his arrearage was more than $500. The order also included calculations which added the previous arrearage to additional arrearage accrued as of October 31, 2003, and subtracted Mr. Sherrod's payment of June 24, 2003, resulting in a new net arrearage of $1,672.96. Mr. Sherrod filed a timely administrative appeal of the initial order.

In his administrative appeal, Mr. Sherrod complained about some purported irregularities in the hearing procedure, detailed his religious objections to making payments to the state's central unit, set out twelve constitutional issues that he claimed invalidated the tribunal's order, and submitted his own calculations of his arrearage prior to May 31, 2003.

Mr. Sherrod's appeal was reviewed by Director of Appeals (for DHS) Caroline Mills, who in a letter opinion dated June 4, 2004, addressed all of the issues raised except for the constitutional issues, which she deemed not to be within the authority of the hearing officer to decide. Ms. Mills concluded that the hearing officer did not abuse her discretion in considering Mr. Sherrod's arrearage after May 31, 2003, and that the decision of the Hearing Officer was fully supported by the testimony and evidence presented. The Initial Order thus became a Final Order.

### III. PROCEEDINGS IN THE TRIAL COURT

Mr. Sherrod filed a petition for judicial review of the final DHS order in the Circuit Court for Robertson County under Tenn. Code Ann. § 36-5-1003. Under that statute, the court's review is limited to the record of the department's hearing. Tenn. Code Ann. § 36-5-1003(c); *see also* Tenn. Code Ann. § 4-5-322. Mr. Sherrod also notified the Tennessee Attorney General that he intended to challenge the constitutionality of the child support statutes. He filed an amended petition on November 16, 2004.

In an order dated October 19, 2004, the trial court granted the Attorney General's motion to be allowed to intervene in the case to defend the constitutionality of the child support statutes. In the same order, the court denied Mr. Sherrod's oral motion to make his child support payments directly to Ms. Wix pending the outcome of the action, ordering that "the petitioner shall continue to make his child support payments through the State of Tennessee's Central Collection and Disbursement Unit in Nashville as previously ordered," and ordered Mr. Sherrod to file a brief in support of his petition within forty-five days of the filing of the administrative record.

Subsequently the Attorney General filed a motion to dismiss Mr. Sherrod's petition for judicial review since he had not filed a brief in support of his petition within the time ordered. Thereafter, the trial court sanctioned Mr. Sherrod for his failure to file the required brief by limiting him to the twelve legal and constitutional issues which he had raised in his petition to rehear filed in the agency below. All other issues were stricken and dismissed.

After a hearing, the Circuit Court entered an order that upheld the final order of the Department and denied Mr. Sherrod's petition. In its findings of fact and conclusions of law, the court held that the submission of Mr. Sherrod's name for federal income tax refund intercept was valid and that he owed child support arrearages of $1,672.86 as of October 31, 2003. The court also held that Mr. Sherrod's constitutional arguments were not sustainable. This appeal followed.

## IV. OBJECTIONS BASED ON RELIGIOUS BELIEFS

Mr. Sherrod objects to being required to pay his child support to the Central Child Support Receipting Unit. As stated earlier, the numbering of one the federal statutes establishing other procedures for support enforcement raised religious concerns in Mr. Sherrod. Those concerns have been his stated reason for failing to pay any support since the June 2003 payment of arrearages as well as his stated basis for seeking administrative appeals and judicial review. In the initial administrative hearing, Mr. Sherrod stated he was appealing the DHS administrative order to redirect child support payments and that, while he had no objection to paying child support, he, as a Christian, would not participate in a system he believed to be a "Satanic entity." In his brief on appeal, Mr. Sherrod declared that "although mentioning other constitutional deficiencies in the law . . . he would not, absent his religious objections, have even requested the [administrative] hearing."

Similarly, before this court, Mr. Sherrod stated in oral argument that only one of the issues he raised in his brief is of importance to him, *i.e.*, that the particular means chosen by the Department to enforce his obligation violates his religious beliefs.[7] Mr. Sherrod declared that he believes that parents have an obligation to support their children, that appropriate legislation to enforce that duty of support in appropriate cases is warranted, and that the only reason he has chosen to appeal a judicial decision involving a relatively small sum of money is that his conscience requires it.

Consequently, we will first address Mr. Sherrod's argument that the First Amendment and his right to freedom of religion prohibit compelling him to send his child support payments to the State or otherwise participate in the child support enforcement system mandated in part by 42 U.S.C. § 666. Regardless of any resolution of other issues, the basic issue of whether Mr. Sherrod can be compelled to send his child support payments to the State is at the heart of this appeal.

Mr. Sherrod states that he is a Born Again Christian and a Sunday School teacher and that he is greatly disturbed that DHS is attempting to compel him to submit to an order which relies for its authority upon a federal statute, 42 USC § 666. He cites us to the Book of Revelations, where the number 666 is associated with the "Mark of the Beast" and the end of days. *See Revelations* 13: 18. He therefore refuses to cooperate in any way with the State's attempt to enforce his obligation of child support. The trial court addressed Mr. Sherrod's religious argument as follows:

---

[7]His brief sets out eleven issues for review, most of which challenge in the most conclusory terms the procedures followed by DHS on the stated ground that those procedures, although prescribed by statute, violate the petitioner's constitutional rights. The Department has responded to each of those issues, setting out in detail the statutory basis and the constitutional justification for the challenged procedures.

Even though Mr. Sherrod's religious beliefs are deemed to be sincere, this Court concludes, as did Judge Koch in the recent decision of *State of Tennessee ex rel. Commissioner of Transportation v. Medicine Bird, Black Bear White Eagle et al.*, 63 S.W.3d 734 (Tenn. Ct. App. 2001), that there are times when it is appropriate for the government to interfere with the religious beliefs of citizens. The government has a legitimate interest in seeing that children are supported and that child support orders are enforced. In this case, the government's legitimate interests outweigh the private interests of parties, such as Mr. Sherrod, in their religious beliefs.

A trial court's rulings on questions of constitutional law are reviewed *de novo* by an appellate court. *Bredesen v. Tennessee Judicial Selection Comm'n*, 214 S.W.3d 419, 424 (Tenn. 2007). The trial court's reliance in this case on the *Medicine Bird* opinion was well-placed. The following excerpt from that opinion sets out the analysis applicable to the case before us:

> The federal and state constitutions place the freedom of belief (or rights of conscience) beyond government control or interference. Accordingly, under the Free Exercise Clause of the First Amendment and Tenn. Const. art. I, § 3 the freedom of belief is absolute and inviolate. *Bowen v. Roy*, 476 U.S. 693, 699, 106 S.Ct. 2147, 2152, 90 L.Ed.2d 735 (1986); *State ex rel. Swann v. Pack*, 527 S.W.2d at 107; *Goodwin v. Metropolitan Bd. of Health*, 656 S.W.2d 383, 389 (Tenn. Ct. App. 1983). As Justice Jackson stated in another First Amendment context:
>
>> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.
>
> *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943).
>
> On the other hand, laws are made to govern actions, and while they cannot interfere with religious beliefs and opinions, they may interfere with religiously motivated conduct. *Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. at 879, 110 S.Ct. at 1600; *Reynolds v. United States,* 98 U.S. 145, 166, 25 L.Ed. 244 (1878). Thus, the freedom to engage in religiously grounded conduct is not absolute. *Cantwell v. Connecticut,* 310 U.S. at 304, 60 S.Ct. at 903. Some religious acts and practices by individuals must yield to the common good. *Bowen v. Roy,* 476 U.S. at 702, 106 S.Ct. at 2153; *United States v. Lee,* 455 U.S. 252, 259, 102 S.Ct. 1051, 1056, 71 L.Ed.2d 127 (1982); *Wolf v. Sundquist,* 955 S.W.2d at 630.
>
> The free exercise protections in the federal and state constitutions are intended to apply to the widest possible scope of religious conduct. Michael W. McConnell, *Free Exercise As the Framers Understood It, in The Bill of Rights: Original Meaning*

*and Current Understanding* 54, 67 (Eugene W. Hickok, Jr. ed.1991). They do not, however, permit "every citizen to become a law unto himself," *Reynolds v. United States,* 98 U.S. at 167, and they do not require the government to conduct its affairs in ways that comport with the religious beliefs of particular citizens. *Bowen v. Roy,* 476 U.S. at 699, 106 S.Ct. at 2152. Government simply could not operate if it were required to satisfy every citizen's religious needs and desires. *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 452, 108 S.Ct. 1319, 1327, 99 L.Ed.2d 534 (1988)

Claims based on religious convictions or rights of conscience do not automatically entitle persons to establish unilaterally the terms and conditions of their relations with the government. *Bowen v. Roy,* 476 U.S. at 702, 106 S.Ct. at 2153. For the past fifty years, the courts have consistently declined to mechanically subordinate society's interests to individual religious conscience. To do so would be to make individual religious beliefs superior to the law of the land, *Reynolds v. United States,* 98 U.S. at 166-67, and would thereby destroy the rule of law on which our pluralistic society is based. *Developments in the Law-Religion and the State,* 100 Harv.L.Rev. 1606, 1704 (1987). Neither the federal nor the state constitutions give individuals a veto power over government actions that do not prohibit the free exercise of religion. *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. at 452, 108 S.Ct. at 1327.

Recognizing that religiously motivated conduct may, in proper circumstances, be subordinated to the common good does not mean that government actions are free from constitutional constraint. The government cannot enact laws that have no purpose other than to prohibit particular religious practices unless these laws are justified by a compelling interest and are narrowly tailored to advance that interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 533, 113 S.Ct. 2217, 2227, 124 L.Ed.2d 472 (1993). Likewise, the government cannot enact laws that discriminate against some or all religious beliefs or that regulate or prohibit conduct simply because it is undertaken for religious reasons. *Braunfeld v. Brown,* 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961); *Fowler v. Rhode Island,* 345 U.S. 67, 69-70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953). Finally, the government cannot interpret, apply, or enforce facially neutral laws in a discriminatory manner. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. at 533-34, 113 S.Ct. at 2227.

Government may, however, enact and enforce facially neutral and uniformly applicable laws that have the incidental effect of burdening a religious practice. When this sort of law faces a free exercise challenge, the government is not required to justify it with a compelling governmental interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. at 531, 113 S.Ct. at 2226; *Kickapoo Traditional Tribe of Tex. v. Chacon,* 46 F.Supp.2d at 653; *Decker v. Carroll Academy,* No.

02A01-9709-CV-00242, 1999 WL 332705, at *5 (Tenn. Ct. App. May 26, 1999) (No Tenn. R. App. P. 11 application filed). The enforcement of a facially neutral and uniformly applicable law that only incidentally burdens religious practice will be upheld if the government demonstrates that the law is a reasonable means for promoting a legitimate public interest. *Bowen v. Roy,* 476 U.S. at 707-08, 106 S.Ct. at 2156.

*State ex rel Commissioner of Transportation v. Medicine Bird Black Bear White Eagle*, 65 S.W.3d 734, 762-63 (Tenn. Ct. App. 2001).

The statute that compels payment to the state's central collection unit in Title IV-D cases is Tennessee Code Annotated § 36-5-116(a)(1), which provides:

> Effective October 1, 1999, the department of human services shall become the central collection and disbursement unit for the state as required by 42 U.S.C. § 654b. All order[s] in Title IV-D support cases, and all orders for income assignments which have directed support to be paid to the clerk of any court, and which are subject to the provisions of 42 U.S.C. § 654b, shall be deemed to require that the support be sent to the central collection and disbursement unit, any order of the court notwithstanding.

Since this is a Title IV-D case, the quoted statute removes any discretion from the Department or a court to allow Mr. Sherrod to send his child support payments anywhere other than to the state's central collection and disbursement unit. Requiring Mr. Sherrod to send his child support to the central unit can have, at most, only an incidental burden on his religious practice. The statute is facially neutral as to religion and is uniformly applicable. Consequently, the issue is whether the statutory requirement for central child support collection is a reasonable means for promoting a legitimate public interest.

## V. STATE AND FEDERAL CHILD SUPPORT ENFORCEMENT EFFORTS

The creation of a central state receiving and disbursement unit for child support, like other procedures regarding the determination and enforcement of such support, was mandated by federal legislation. *See* 42 U.S.C. § 654b(a)(1)[8]. These federal mandates were part of an ongoing attempt

---

[8]That section provides :

In order for a State to meet the requirements of this section, the State agency must establish and operate a unit (which shall be known as the "State disbursement unit") for the collection and disbursement of payments under support orders -
> (A) in all cases being enforced by the State pursuant to section 654(4) of this title; and
> (B) in all cases not being enforced by the State under this part in which the support order is initially issued in the State on or after January 1, 1994, and in which the income of the noncustodial parent is subject to withholding pursuant to section 666(a)(8)(B).

to strengthen the nationwide effectiveness of child support enforcement.

Although states were historically responsible for enforcement of child support orders, the federal government became involved in enforcement efforts when it became clear the a nationwide problem existed. The United States Congress passed the Child Support Enforcement Act of 1975, often referred to as Title IV, Part D of the Social Security Act, 42 U.S.C. §§ 651 *et seq.*, because of the concern over decreased support of children after divorce, or in single parent families, and the lack of uniform and effective enforcement of support orders. The Act resulted in the creation of a federal child support enforcement office as well as state enforcement agencies. This Act focused on children whose families received public assistance through the Aid to Families with Dependent Children (AFDC) program and was an attempt to reduce the need for such assistance by requiring parents to support their children.

In 1981, Congress authorized the IRS to withhold portions of tax refunds due to parents who were delinquent in their child support. The Child Support Enforcement Amendments of 1984, Pub. L. No. 98-378, 98 Stat 1874 (1984), opened child support enforcement services to families not receiving AFDC assistance and required all states to adopt child support guidelines and income withholding or wage assignment as well as other enforcement techniques aimed at non wage-earning parents. It included measures to improve interstate enforcement child support orders. Further Congressional action in 1986 resulted in a requirement that states enact laws making child support orders judgments entitled to full faith and credit and prohibiting retroactive modification of support orders. Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, 100 Stat 1874 (1986).

In 1988 Congress passed the Family Support Act of 1988, Pub. L. No. 100-485, 102 Stat 2343 (1988), which required states to adopt laws making child support guidelines a rebuttable presumption, requiring regular adjustment of the amount of support in cases handled by the state enforcement agency, and providing for immediate wage assignment in most cases, as well as implementing an automated enforcement system. In 1992 Congress made it a federal crime to willfully fail to support a child in another state. Child Support Recovery Act of 1992, Pub. L. No. 102-521, 106 Stat. 3403 (1992).

In the most significant recent change, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), codified at 42 U.S.C. §§ 601-610, 612-13, 615-17, which made several changes affecting child support collection and enforcement. The Act, which put into place the Clinton administration's "welfare to work" program, was intended to reduce reliance on AFDC by requiring that parents currently receiving that assistance obtain employment and support themselves and their families within a period of time and with specific types of services designed to prepare them for work. The Act abolished AFDC and replaced it with Temporary Assistance for Needy Families (TANF), which involved block grants to states.

A state's eligibility to receive TANF funds was tied to its state child support enforcement office's compliance with federal requirements, both existing and newly enacted.[9] *See* 42 U.S.C. § 602(a)(2). Thus, Congress has continued to make federal funding for benefit programs contingent upon compliance with the various federal requirements for more effective child support procedures. *See Baker v. Baker*, No. 01A01-9509-CV-00428, 1997 WL 749452, at *2-3 (Tenn. Ct. App. Dec. 5, 1997) (describing the relationship between AFDC funding and Congressional efforts to increase the effectiveness of child support enforcement so as to reduce custodial parents' need to seek AFDC funding, among other positive results).

The PRWORA also instituted requirements for additional enforcement techniques including additional income withholding, asset seizure, and the withholding or suspension of state-issued licenses, such as drivers' licenses, from parents delinquent in their child support. *See* 42 U.S.C. §§ 666(a)(1), 666(a)(14), and 666(a)(16). It also authorized denial or revocation of a passport for a delinquent parent who owed more than $5000 in child support.

These and other provisions for stronger enforcement of child support, enacted over a number of years, are codified in various provisions of Title 42 of the United States Code. Interestingly, § 666, the section on which Mr. Sherrod's objection is based, is simply a listing of the statutorily required procedures, as well as required legislative provisions, "to improve effectiveness of child support enforcement." The list does not include requiring that child support payments be made to a centralized receipt and disbursement unit, although that requirement is codified at 42 U.S.C. §654b(a)(1).

Tennessee has adopted the statutory revisions required by the federal legislation and apparently has adopted the required administrative procedures. Implementation of these requirements, including requiring that most child support payments, and that all such payments in IV-D cases, be made to the central collection and disbursement unit, was necessary to insure Tennessee access to TANF funds to provide services to our neediest citizens. Thus, there can be no question that Tennessee's adoption of the federal requirements was a reasonable method to achieve an important public purpose.

Mr. Sherrod's challenge, therefore, must be addressed to the federal requirements. The requirement for centralized state collection and disbursement in almost all cases was enacted in 1996 as part of the PRWORA, and the necessity or wisdom for the requirement and other changes in child support enforcement were supported by Congressional findings that: promotion of responsible parenthood is integral to the well-being of children; in 1992 only 54% of single parent families had an established support order, with only half of those receiving the full amount ordered; only 18% of cases enforced through a public support enforcement system had a collection; and that there had been a dramatic rise in the need for welfare benefits to those children who were not receiving regular child

---

[9]Congress subsequently provided incentive payments to states that complied with the federal guidelines as well as reduced penalties for those trying to comply. Child Support Performance and Incentive Act of 1998, Pub. L. No. 105-200, 112 Stat. 645.

support payments. H.R. CONF. REP. 104 -725, *6-9, 1996 U.S.C.C.A.N. 2649.

It cannot be disputed that parental support of minor children is a long-established legal obligation supported by well-established public policy. Mr. Sherrod does not dispute the importance of parents financially supporting their children. Further, it cannot be disputed that enforcement of that support is an important objective. Both the children who receive the support and society at large are better off when children receive adequate support. Policymakers at both the federal and state level have recognized the importance of enforcing child support orders and the detriment that can result to the children entitled to parental support and to the public, if such support is not provided. At issue is whether the federally mandated procedures for strengthening child support enforcement, including the requirement that support be paid to a central state collection unit, are reasonable methods to further the important public purpose of enforcing parents' support obligations. We conclude they are. Payment to the agency charged with child support enforcement allows that agency current information regarding the status of payments so that necessary enforcement action may be taken more expeditiously.

Although we have found no case examining the precise issue raised herein, there are a number of cases wherein the state's interest in establishing and enforcing child support orders has been found sufficiently important to override certain challenges based on the free exercise clause in situations where a greater burden or intrusion existed. *See, e.g., Weinstein v. Albright,* 2000 WL 1154310 (S.D.N.Y. Aug. 14, 2000) (upholding the denial of a father's passport because of child support arrearages, finding that restricting passports for persons who owe arrearages is reasonably related to the substantial government interest in promoting the payment of child support arrearages, that the restriction was a valid and neutral law of general applicability, and that the denial did not violate the free exercise clause simply because it prevented the father from traveling overseas for religious reasons); *Office of Child Support v. Stansione,* 910 A.2d 882 (Vt. 2006) (affirming revocation of mother's driver's license for failure to pay support even though she lived in a religious community where members did not earn salaries and holding that mother had failed to show that suspension of her driving license was a substantial burden on the free exercise of her sincerely-held religious beliefs, even under the strictest test); *Lewis v. Department of Transportation*, 146 P.3d 684 (Idaho Ct. App. 2006) (upholding the denial of a driver's license because the applicant refused to supply his social security number on religious grounds, finding that the requirement that all applicants provide the number was part of the federal requirements regarding enforcement of child support that demonstrated a strong policy reason for collecting social security numbers "as an interstate tool in locating parents who are remiss in their support payments," and holding that federal law preempted the state's Free Exercise of Religion Act); *State ex rel Maxwell v. Triklis*, 2007 WL 879670 (Ohio App. March 26, 2007) (holding that requiring the defendant to submit to having a swab taken for DNA testing to establish paternity was the least restrictive means to resolving the dispute over paternity, which was necessary to ordering child support, that the "state has a substantial interest in safeguarding the rights of the child to needed support from his or her natural father, while at the same time protecting the interests of its taxpayers," and that the testing did not violate the father's free exercise rights even under the higher standard of the Ohio Constitution).

## VI. OTHER CHALLENGES

In addition to his argument based on the free exercise clause of the Tennessee Constitution, Mr. Sherrod has also raised a number of challenges to the legality or validity of the administrative proceedings that resulted in affirming the tax intercept notices and establishing his arrearages. [10]

Pursuant to Tenn. Code Ann. § 36-5-1003, judicial review of administrative hearing decisions by DHS regarding child support is to be conducted as provided in Tenn. Code Ann. § 4-5-322, the section on judicial review of administrative decisions under the Administrative Procedures Act. Accordingly, judicial review is confined to the department's record. Tenn. Code Ann. § 4-5-322(g). A court may reverse or modify the administrative decision if the rights of the petitioner have been prejudiced because the decision was made in violation of constitutional or statutory provisions, in excess of the statutory authority of the agency, or upon unlawful procedure or if the decision was arbitrary or capricious or characterized by abuse of discretion, or if the decision is unsupported by substantial and material evidence in the record. Tenn. Code Ann. § 4-5-322(h).

The standard of review before this court is the same as that in the trial court. *Terminix Int'l Co., L.P. v. Tenn. Dept. of Labor*, 77 S.W.3d 185, 191 (Tenn. Ct. App. 2001). Both courts review factual issues upon a standard of substantial and material evidence. *Humana of Tenn. v. Tenn. Health Facilities Comm'n*, 551 S.W.2d 664 (Tenn. 1977); *Gluck v. Civil Service Comm'n*, 15 S.W.3d 142, (Tenn. Ct. App. 1999).

An allegation under Tenn. Code Ann. § 4-5-322(h)(l) that an agency decision was made in violation of a constitutional or statutory provision, such as many of the allegations herein, raises questions of law. Questions of law, as in other cases, are reviewed *de novo*. *Davidson v. Lewis Bros. Bakery*, 227 S.W.3d 17, 17 (Tenn. 2007). This generally applicable rule applies to judicial review of administrative agency decisions under Tenn. Code Ann. § 4-5-322(h). Where resolution of an issue presented in a judicial review of an administrative decision under the UAPA hinges upon the interpretation and application of a statute or constitutional provision, courts will review the question *de novo*. *King v. Pope*, 91 S.W.3d 314, 318 (Tenn. 2002). That is because construction

---

[10]Mr Sherrod's other arguments regarding the validity of the statutory procedure for administrative review can be grouped. Asserting constitutional challenges are the following: Whether or not the continuing use of U.I.F.S.A. tracking tools against the Petitioner/Appellant violates his right to privacy and due process under the Tennessee or United States Constitutions; whether or not the power granted to the Department's administrative child support tribunals violates the separation of powers required by the Tennessee Constitution; whether or not the State's sanction of two separate processes for hearing child support cases is a violation of the Petitioner/Appellant's Equal Protection rights; and whether the Tennessee General Assembly had the constitutional authority to enact these statutes. Mr. Sherrod also raises several issues regarding the Department's hearing officers: whether or not the hearing of child support cases by non-attorney hearing officers constitutes the unauthorized practice of law and whether or not the Departments's hearing officers must meet the judicial electoral requirements set forth in the Tennessee Constitution. Finally, he raises several issues relating to the administrative record: whether or not the Department must maintain a central depository for records and whether or not the Department's child support tribunals must maintain a local clerk for the keeping of records in accordance with the Tennessee Constitution.

and application of a statute or constitutional provision present questions of law. *United States v. Bajakajian*, 524 U.S. 321, 336-37, n.10, 118 S. Ct. 2028, 2037-38 n.10 (1998) (holding that "[T]he question whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context *de novo* review of that question is appropriate."); *Bredesen v. Tennessee Judicial Selection Comm'n*, 214 S.W.3d at 424 (holding that a trial court's rulings on questions of constitutional law are reviewed *de novo* by an appellate court); *Bellsouth Telecommunications, Inc. v. Greer*, 972 S.W.2d 663, 672 (Tenn. Ct. App. 1997) (stating that "the search for the meaning of statutory language is a judicial function.")

The administrative process involved in this case, including the administrative review of the notices and arrearages as requested by Mr. Sherrod, subject to judicial review under the Administrative Procedures Act as occurred herein, do not violate the separation of powers provisions of either the United States Constitution or the Tennessee Constitution. *See Plasti-Line, Inc. v. Tennessee Human Rights Comm'n*, 746 S.W.2d 691 (Tenn. 1988). The separation of powers provisions of the Tennessee Constitution, found in Article II, Sections 1 and 2, prohibit persons in any one of the three branches of government from exercising any of the powers properly belonging to another branch. However, the Tennessee Supreme Court has long noted that it is impossible to preserve perfectly "theoretical lines of demarcation between the executive, legislative and judicial branches of government.*" In re Petition of Burson*, 909 S.W.2d 768, 774 (Tenn. 1995) (quoting *Underwood v. State*, 529 S.W.2d 45, 47 (Tenn. 1975)). While the three branches of government are separate and co-equal, they are also interdependent, and their functions often overlap. *Bredesen v. Tennessee Judicial Selection Commission*, 214 S.W.3d at 434 (quoting *State v. King*, 973 S.W.2d 586, 588 (Tenn. 1998)).

It is the function of the judicial branch of government to interpret the law and to determine the constitutionality of actions by the other two branches. *Richardson v. Tennessee Board of Dentistry*, 913 S.W.2d 446, 453 (Tenn. 1995). The Tennessee General Assembly has the constitutional authority to establish courts and prescribe their jurisdiction. Tenn. Constitution, Art. VI, § 1; *Duncan v. Rhea County*, 287 S.W.2d 26, 30 (Tenn. 1955). The legislature has the authority to make, alter and repeal the law, and the executive branch has the power to administer and enforce the laws. *Id.* at 453 (citing *State v. Brackett*, 869 S.W.2d 936, 939 (Tenn. Crim. App. 1993)).

There can be no serious question at this date that the legislature may constitutionally grant administrative agencies authority to act in a quasi-judicial role in the exercise of the executive power to enforce the law. A legislative enactment does not constitute an impermissible encroachment on the judicial branch of government if that statute "does not frustrate or interfere with the adjudicative functions of the courts." *Underwood*, 529 S.W.2d at 47.

In the case before us, Mr. Sherrod sought review of a tax intercept notice and the calculation of arrearage underlying the issuance of that notice. He also objects to the notice that he pay his child support to the central collection unit. The administrative hearing determined the amount of his arrearage and validated the tax intercept notice. Those determinations were reviewed by the trial court, and his constitutional challenges were determined by the trial court. *See Richardson*, 913

S.W.2d 446. We find no separation of powers violation in the administrative procedures at issue herein, which are the only procedures that affected Mr. Sherrod.

We also conclude there is no merit in Mr. Sherrod's arguments regarding the use of administrative hearing officers in the administrative hearing. First, the record before us does not indicate that the hearing officer herein was not licensed as an attorney. Consequently, Mr. Sherrod cannot claim that his rights were somehow adversely affected by a decision by a nonlawyer. Additionally, however, the type of decision made by the hearing officer herein, *i.e.,* the calculation of the amount of support due and the amount paid, does not require "the professional judgment of a lawyer."[11] *See In re Petition of Burson*, 909 S.W.2d at 776. Finally, it is clear that the Department's hearing officers are not judges of inferior courts and, therefore, are not subject to the Constitutional provisions regarding the election of judges. *See Plasti-Line, Inc.*, 746 S.W.2d at 694.

In sum, we find no merit to Mr. Sherrod's challenges to the validity of the administrative proceedings by which he questioned the tax refund intercept notices or the amount of arrearages he owed.

## VII. INTERCEPT NOTICES AND ARREARAGE

The judgment that is appealed herein affirmed the agency's decision that the two tax refund intercept notices were validly issued and, ancillary to that finding, that Mr Sherrod owed arrearages sufficient to trigger the issuance of those notices. The trial court found that the submission of Mr. Sherrod's name for federal income tax refund intercept was valid and that he owed child support arrearages of $1,672.86. Absent from this appeal is the question of whether the Department's calculation of arrearages was supported by the evidence. That absence may be attributed, at least in part, to the trial court's ruling that Mr. Sherrod was limited in the trial court to the issues he raised in his motion to the Department to alter or amend its order. This ruling resulted from Mr. Sherrod's failure to file a brief within the time ordered by the court.

On appeal, Mr. Sherrod asserts that the trial court's sanctioning him by limiting the issues in his judicial review proceeding was in error. His argument is based on assertions regarding state of the administrative record filed in the trial court. Having reviewed his arguments and the entire record before us, we find that the trial court acted well within its discretion in limiting the issues Mr. Sherrod could raise to those set out in his motion to alter or amend filed with the Department.

As a consequence, the factual question of whether the Department's decision that Mr. Sherrod was sufficiently in arrears so as to support the issuance of the tax refund intercept notices, as well as any questions about the Department's decision as to the amount of arrearages he owed,

---

[11]We need not address the issue of whether evidentiary rulings require professional judgment since the hearing officer made no such ruling adverse to Mr. Sherrod that is the subject of this appeal.

-14-

are not before us in this appeal.[12]

However, after oral argument this court ordered the Department to file a supplemental brief "detailing its conclusion that the evidence proved that Mr. Sherrod was more than $500 in arrears even when given credit for all payments made either directly to Ms. Wix or the trial court" with specific citations to evidence in the administrative record. Mr. Sherrod was given the opportunity to file a similarly specific supplemental brief in response if he desired. Our reasoning was that if Mr. Sherrod was more than $500 in arrears even when given credit for amounts paid directly to his former wife, the issue of impingement on his free exercise rights was not implicated. "It is the duty of all courts . . . to pass on a constitutional question only when it is absolutely necessary for the determination of the case and of the rights of parties to the litigation." *DeLaney v. Thompson*, 982 S.W.2d 857, 858 (Tenn. 1998).

We have reviewed the supplemental briefs and the administrative record.[13] The calculations of both parties revealed a degree of agreement on how much Mr. Sherrod had paid during the period in question before the first intercept notice and, putting aside some small anomalies, it appears that Mr. Sherrod paid Ms. Wix $8,706. The parties' calculations of the amount due, however, differed. Nonetheless, even if we use Mr. Sherrod's figure as to the amount due ($9,519.89), it is clear that his arrearage was in excess of $500 as of May 31, 2003, and remained so at the time he received his first Federal Tax Refund Offset notice.[14] Therefore, his arrearage exceeded the amount necessary to trigger the notice.

Because all the payments at issue before the June notice were made directly to Ms. Wix and were counted by the Department in calculating the arrearage, the first tax refund intercept notice was not related in any way to Mr. Sherrod's failure to pay based on his religious objections. In fact, he was not directed to send his payments to the central receipting unit until late May or early June, and he paid his arrearage (or most of it) to that unit after receiving the intercept notice. Consequently, the issue of whether payment to the central collection unit infringes on Mr. Sherrod's free exercise of his religion is not implicated by the first notice.

---

[12]If factual questions were raised in this appeal, we could reverse or modify the administrative decision if it were unsupported by evidence that is both substantial and material in the light of the entire record, and in determining the substantiality of the evidence, the reviewing court may take into account whatever in the record fairly detracts from its weight, but "the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Tenn. Code Ann. § 4-5-322(h)(5); *Sanifill of Tennessee Inc., v. Tennessee Solid Waste Disposal Control Bd.*, 907 S.W.2d 807, 810 (Tenn. 1995).

[13]This task was not without it challenges. The volume of checks and the lack of explanation for most of them or for the differing amounts sometimes paid made the task difficult.

[14]In order to be able to assert that his arrearage was below the $500 threshold, Mr. Sherrod adds the check for $1,188.57 he had paid on June 24, 2003 to the Central Receipting Authority. This payment may have cleared up the arrearage, or at least reduced it below $500.00, but could not have negated the validity of the Federal Tax Refund Offset Notice which was sent out before the payment was made and accurately reflected his arrearage at the time it was sent.

However, the second notice resulted from arrearages because Mr. Sherrod refused to send any more child support payments to the state's central collection unit after his payment of accrued arrearage in June. Mr. Sherrod's failure to make any subsequent payments allowed the arrearage to build up again. From August 1 to November 6,[15] when the second Federal Tax Refund Offset Notice was sent, at least thirteen weeks had elapsed, and thus Mr. Sherrod had accrued a new obligation of at least $975. Thus, the Federal Tax Refund Offset threshold was reached once again. Because Mr. Sherrod's arrearage and the intercept notice arose from his refusal to send child support to the state's central collection unit, his assertion of impingement on his free exercise rights is an issue properly before us.[16]

## VIII. CONCLUSION

The judgment of the trial court affirming the final administrative order is affirmed. costs on appeal are taxed to the appellant, Michael Wallace Sherrod, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

---

[15]Mr. Sherrod was not required to pay support in June or July.

[16]There exists some question as to how the November tax intercept notice was included in the administrative hearing officer's decision since Mr. Sherrod's notice requesting a hearing addressed only the earlier notices and was filed months before the November notice was issued. A review of the transcripts of the prehearing conference and the administrative hearing reveals that the hearing officer presiding at the pre-hearing conference stated unequivocally that any matters arising after the request for hearing was filed on June 20 were not properly considered in this matter and would have to be the subject of a separate proceeding, assuming Mr. Sherrod timely requested that review. Nonetheless, the November notice and arrearages accumulated after June were considered at the administrative hearing. Although the hearing officer stated many times that only notices and actions taken before Mr. Sherrod's June 20 request for administrative hearing would be considered, the Initial Order addressed the November 6 Income Tax Refund Intercept Notice and upheld the issuance of the notice and the amount of arrearages through October 31, 2003. In his administrative appeal of the Initial Order, Mr. Sherrod objected to the inclusion of any matters occurring after his June 20 request for a hearing. In the Final Order, however, the Department held that although the original appeal included only the June notices, the hearing officer had not abused her discretion in considering the November notice and calculating total arrearage because the hearing was held after the November notice and because Mr. Sherrod appealed the amount of arrears owed, making a determination regarding the amounts paid and owed up to at least October 31 necessary. The Final Order also stated that Mr. Sherrod had made no objection to including the November notice at the administrative hearing, a conclusion that we find is not supported by a reading of the transcript of the hearing. However, the issue of the propriety of including the November notice and the calculations underlying it is not before the court in this appeal. We also note that Mr. Sherrod apparently did not seek administrative review of that notice and that he admits that he made no support payments during the time in question.